# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Mark Schumacher,                                   Civil No. 05-531 (DWF/AJB)

                    Plaintiff,

v.                                                 **MEMORANDUM
                                                   OPINION AND ORDER**

Argosy Education Group, Inc., an
Illinois corporation d/b/a Argosy
University/Twin Cities; Education
Management Corporation, a
Pennsylvania corporation;
Dr. Jack B. Schaffer; Dr. Phyllis C.
Solon; and Nicholas R. Griffith,

                    Defendants.

---

Kenneth W. Nickel, Esq., Kahdeman, Nickel & Frost and Wayne B. Holstad, Esq.,
Attorney at Law, counsel for Plaintiff.

Jennifer A. Dellmuth, Esq., Roy A. Ginsburg, Esq., and Nicole Haaning, Esq., Dorsey &
Whitney LLP, counsel for Defendants.

---

## Introduction

This matter is before the Court pursuant to a Motion for Summary Judgment

brought by Defendants Argosy Education Group, Inc., an Illinois corporation d/b/a

Argosy University/Twin Cities ("Argosy"); Education Management Corporation, a

Pennsylvania corporation; Dr. Jack B. Schaffer; Dr. Phyllis C. Solon; and Nicholas R.

Griffith (collectively, the "Defendants").  In his First Amended Complaint (the

"Complaint"), Plaintiff Mark Schumacher asserts 11 causes of action, including claims

for violation of the Minnesota Human Rights Act ("MHRA"), breach of contract,

common law arbitrary expulsion, violations of various constitutional rights under the United States and Minnesota Constitutions, libel, and slander.  For the reasons set forth below, the Court grants Defendants' motion.

## Background[1]

Argosy is a private university that confers, among other degrees, Doctor of Psychology ("Psy.D.") degrees.  Jack Schafer, Phyllis Solon, and Nicholas Griffith (the "Individual Defendants") are faculty members at Argosy.  Plaintiff Mark Schumacher is an evangelical Christian who, based on his religious beliefs, believes that gays or lesbians who engage in homosexual activity are committing a sin.  Schumacher was a student in Argosy's Psy.D. program from September 2002 through June 2004.  This lawsuit arises out of Argosy's dismissal of Schumacher from its Psy.D. program in June 2004.

During the spring 2003 semester, Solon, then Chair of the program's Diversity Committee, posted a note on the door of the graduate student's lounge requesting "Suggestions for subscriptions to: journals/magazines/local press that will support greater

---

[1]     Defendants request that the Court strike the affidavits of Joy Fleming, Anne Hall, and Tom Edwards, which Schumacher included with his memorandum in opposition to summary judgment.  The Court grants Defendants' request on several grounds.  First, Schumacher did not properly disclose the affiants as people with knowledge during discovery.  *See* Fed. R. Civ. P. 37(c)(1); *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004).  Second, the affidavits purport to establish "facts" beyond the affiants' personal knowledge.  *See* Fed. R. Civ. P. 56(e); *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979 (8th Cir. 2004).  Third, the affidavits contain inadmissible hearsay testimony.  *See* Fed. R. Evid. 802; *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001).  Fourth, the affidavits contain broad, conclusory allegations unsupported by specific facts.  Finally, the affidavits contain irrelevant allegations regarding claims that are not part of this

(Footnote Continued on Next Page)

visibility of diverse cultures." (Aff. of Jennifer Dellmuth in Supp. of Defs.' Mots. for

Summ. J. ("Dellmuth Aff."), ¶ 5, Ex. 4, Dep. of Mark Schumacher ("Schumacher Dep.")

at Ex. 1; ¶ 14, Ex. 13, Dep. of Phyllis Solon ("Solon Dep.") at 50–51.) In response,

Schumacher anonymously wrote on the note, "cut back on gay mags please!" (Affidavit

of Mark Schumacher ("Schumacher Aff.") at ¶ 19.) The lounge already contained

reading materials such as "The Advocate" and "Lavender, " which related to gay, lesbian,

bisexual, and transgender ("GLBT") issues. Schumacher was offended by some of the

advertisements in these materials and considered them "mildly pornographic" and

inappropriate for a professional setting. (Schumacher Aff. at ¶ 17.)

 Other students were upset by Schumacher's comment and brought it to Solon's

attention. (Solon Dep. at 114–15.) In response to Schumacher's comment, Solon wrote,

"This comment is offensive and does not address the above direction." (*Id.*) Given the

context of her request for publications that would promote diversity, Solon thought

Schumacher's anonymous comment was offensive because it sought to reduce the amount

of reading material related to the gay population.

 Shortly thereafter, a student complained to Griffith that Schumacher's anonymous

comment could have a negative effect on gay and lesbian students' sense of safety in the

community. (Dellmuth Aff., ¶ 6, Ex. 5 Dep. of Nicholas Griffith ("Griffith Dep.") at

49-50.) The student, however, misquoted the language of the comment. The student told

---

(Footnote Continued From Previous Page)
litigation.

Griffith that the comment read, "No more fag mags please." (*Id.* at 69–70.) Griffith, unaware of who wrote the comment, raised the note as a topic of discussion in one of his classes. Griffith allegedly stated that he could not believe "that there was a homophobic student in the student body" and that someone would write such a "homophobic comment." (Schumacher Dep. at 71.) Griffith also allegedly stated that the note contained "hate speech." (Schumacher Aff. at ¶ 20.)

In response, Schumacher, who was a student in Griffith's class that day, volunteered that he had written the comment and stated that he "was not homophobic" and only intended to convey that he "wanted to see more diversity of magazines in [the lounge]." (*Id.* at 73.) He apologized for offending anyone. The exact language of the comment never came up during the classroom discussion because Schumacher assumed that Griffith and the other students had seen the comment, which was still posted on the lounge door. Therefore, Schumacher did not correct Griffith's mistaken belief about the language of the comment, and Griffith continued to believe that Schumacher wrote "fag" instead of "gay." After class, Schumacher again apologized to Griffith for any offense taken. Griffith told Schumacher that he was glad that Schumacher "had the courage to clear that up." (Schumacher Dep. at 79.) Schumacher told Griffith that he wanted the event to be "over," and Griffith responded that it was "over." (*Id.* at 83.)

At the end of the spring 2003 semester, the faculty conducted its annual review of all current students to identify whether any professors had concerns with any particular student that might affect that student's progress in the program. Faculty members raised

concerns about Schumacher.  Faculty expressed concerns that Schumacher made public remarks that could be interpreted as insensitive or denigrating, in particular to gays and lesbians.  One faculty member stated that Schumacher was verbally impulsive in class because he made inappropriate comments without recognizing their impropriety.

Upon learning that other professors had concerns about Schumacher's impulsivity, Griffith told the faculty about Schumacher's comment in response to Solon's request for subscriptions to publications that would support greater visibility of diverse cultures.  Griffith was still operating under the mistaken belief that Schumacher had used the adjective "fag" instead of "gay," and therefore incorrectly quoted Schumacher's comment.  Griffith told the faculty that Schumacher admitted to writing the comment and that he discussed the matter both during class and privately with Schumacher.  Based on the faculty's concerns regarding Schumacher's impulsivity and the nature of the observations or verbalizations he had expressed, the faculty referred Schumacher to the Student Evaluation Committee ("SEC").  The SEC, consisting of students and faculty members, meets with referred students to determine whether there are issues affecting those students' educational progress and decides what steps, if any, students should take to address any issues.

Schaffer, then head of the SEC, sent Schumacher a letter, dated June 5, 2003, informing him that the faculty had referred Schumacher to the SEC based on concerns regarding his attitudes and behaviors.  On June 13, 2003, Griffith sent Schaffer an e-mail reiterating that Schumacher had written "No more fag mags" on the note and

characterizing the comment as a "homophobic remark."  (Aff. of Kenneth W. Nickel in

Supp. of Pl.'s Opp'n to Mot. for Summ. J ("Nickel Aff.") at Ex. 6.)  Griffith also

represented that he had personally observed the note, but he later admitted in his

deposition that he had not.  Schaffer then forwarded Griffith's e-mail to Paul Olson and

Marcia Bennett, the other SEC faculty members.  On June 19, 2003, the SEC committee

met with Schumacher.  Schumacher contends that the only concern the SEC members

raised was what he had written in response to the request for suggestions to publication

subscriptions.  The SEC members asked Schumacher whether he had written "Get rid of

the fag mags."  (Schumacher Dep. at 118.)  Schumacher explained that he used the word

"gay" rather than the word "fag."  (*Id.* at 119.)  The SEC retrieved a copy of the note and

verified what Schumacher actually wrote.  The SEC also asked Schumacher whether he

believed that homosexuality is a sin.

Bennett felt that Schumacher's comment reflected poor judgment and a lack of

sensitivity.  Schaffer also concluded that Schumacher had "a lack of sensitivity . . .

towards people with different sexual orientation."  (Dellmuth Aff., ¶ 12, Ex. 11 Dep. of

Jack Schaffer ("Schaffer Dep.") at 105.)  In order to address its concerns, the SEC

required Schumacher to complete the following tasks:  (1) meet with his advisor to

discuss the experience; (2) read a particular article in *American Psychologist* and write a

"concise response"; (3) devote 50 hours of community service to an organization that

serves GLBT clients; and (4) meet with the SEC in the fall of 2003 to discuss what he had

learned from fulfilling the first three requirements.

Schumacher appealed the SEC's decision.  He claimed that the SEC's decision was biased because committee members may have believed, prior to the meeting, that Schumacher's comment said "fag mags" rather than "gay mags."  Additionally, Schumacher appealed the decision on the ground that he was denied due process. Specifically, Schumacher contended that the SEC failed to provide him with a copy of the SEC's Policies and Procedures when he was notified of his referral and that the SEC failed to inform him of the appeals process when he received the SEC's recommendations.  Olson, who was both Schumacher's advisor and a member of the SEC, supported Schumacher's appeal.  Olson stated in a letter to the Appeals Committee that had he known what Schumacher actually wrote, he would not have agreed to refer Schumacher to the SEC.  Olson also asserted in the letter that the SEC violated Schumacher's right to due process.

An Appeals Committee met with Schumacher on September 19, 2003.  The Appeals Committee found that there were procedural irregularities in Schumacher's first meeting with the SEC and granted him a *de novo* review by a second SEC.  The second SEC consisted of different faculty members and students than those who had served on the first SEC or Appeals Committee.  In particular, Solon was the chair of the second SEC, along with faculty members Thomas McKenna and James Nelson and two student members.  Solon sent Schumacher a letter dated October 16, 2003, which stated that at the annual review of students following the spring semester of 2003, faculty members expressed concern about "immaturity and lack of judgment as evidenced by written

comments and verbal interactions with faculty and students that were disparaging of Minority members of the community."  (Schumacher Aff. at Ex. 14.)

Prior to the second SEC's meeting with Schumacher, Solon sent an e-mail to the faculty requesting information about Schumacher that would be relevant to the evaluation process.  Solon understood from the information that she gathered that the faculty referred Schumacher to the SEC because of its concerns about Schumacher's verbal impulsivity, poor judgment, and failure to realize how his comments affected others.  Additionally, faculty member Shannon Schmidt, Director of Practicum Training, told Solon that Schumacher was unwilling to apply to practicum sites that required a background check because he had been convicted of driving under the influence of alcohol ("DUI").  Solon also learned that Schumacher may have been involved in drunk and disorderly behavior at the 2003 Spring Fling, a party sponsored by the Argosy student senate.

On October 30, 2003, the second SEC met with Schumacher.  During the meeting, Solon explained to Schumacher that his "cut back on gay mags!" comment was just one example of the verbal impulsivity and lack of social awareness that caused him to be referred to the SEC.  The second SEC also discussed a comment Schumacher made in one of his classes about "people in poverty and not working" and the effect it had on other students in the class.  (Solon Dep. at 218–19.)  Further, the SEC discussed other instances where there were misunderstandings between Schumacher and faculty members caused by Schumacher's inability to understand his effect on others.

Additionally, the second SEC discussed Schumacher's management of his

Attention Deficit Hyperactivity Disorder ("ADHD").  Schumacher reported that he had been diagnosed with ADHD when he was a child but that he was not taking medication. The second SEC also asked Schumacher about his alcohol consumption at the Spring Fling and whether there had been other occasions when he experienced negative consequences as a result of his alcohol use.  Schumacher reported that there were none. The second SEC, however, was aware that Schumacher had previously been convicted of a DUI.  Schumacher admitted the conviction only after being confronted about it.

On October 31, 2003, Solon sent Schumacher a letter stating that the second SEC "has concerns about your development and training as a therapist at this time." (Schumacher Aff. at Ex. 15.)  Solon further stated that the committee needed more information to make a decision and would be gathering more information about the issues raised in the meeting over the next 30 days.  The second SEC then sent Schumacher a letter dated December 4, 2003, in which the committee stated that their primary area of concern was Schumacher's "general lack of social awareness and sensitivity, including being aware of [his] impact on those around [him]."  (Solon Aff. at Ex. A.)  The second SEC identified "questions about consistency with prescribed medication for ADHD and issues surrounding the use of alcohol" as secondary concerns.  (*Id.*)  The second SEC issued a new set of requirements for Schumacher to follow:  (1) develop a concrete and specific plan to address the second SEC's primary and secondary concerns; (2) work with Solon as a faculty mentor to monitor his plan and progress around these issues; (3) submit a personal statement addressing insight and progress around the stated issues to the

second SEC on June 17, 2004; and (4) meet with the SEC during the last week of June

2004 to go over what Schumacher learned during the previous six-month period.

Solon sent Schumacher a letter dated January 13, 2004, reminding him of the

remediation plan and asking him to contact her within a week to schedule a meeting.  On

February 3, 2004, Schumacher met with Solon.  During that meeting, Solon reviewed the

directives that the second SEC required Schumacher to complete before the end of the

semester.  Solon told Schumacher at this meeting that he was responsible for producing a

written plan to address the second SEC's concerns.  Solon later sent Schumacher a

follow-up letter dated February 19, 2004, confirming that Schumacher had agreed to

produce a written plan to address the second SEC's concerns and to set up regular

meetings with Solon so Solon could monitor his progress.

On March 2, 2004, Schumacher met with Solon.  By that meeting, Schumacher

had still not produced a written plan.  Schumacher told Solon that he had been working

with his diagnostic practicum site supervisor, Gay Hallberg, to become more aware of

how his behavior impacted other people.  Solon asked Schumacher to get a letter from

Hallberg describing the issues Hallberg and Schumacher had been working on to help

document Schumacher's progress.  Schumacher replied that it was not possible for him to

obtain a letter because Hallberg was too busy.  At the end of the meeting, Schumacher

told Solon that he would check in with her in a month.

Schumacher did not check back with Solon in a month.  As a result, Solon sent

Schumacher a letter dated April 5, 2004.  In that letter, Solon reminded Schumacher that

he had not yet produced a written plan to address the second SEC's concerns and warned him that his time to address those issues was running out because the end of the spring semester was nearing. On April 9, 2004, Schumacher called Solon and told her that he was not aware that his plan needed to be in writing. Schumacher then promised to submit a written plan to Solon within two weeks.

A week later, on April 16, 2004, Schumacher sent Solon a letter in which he stated, "I am writing in order to outline a plan to address concerns relating to my sensitivity, social awareness, and knowledge of my impact on others around me." (Schumacher Dep. at Ex. 12.) Schumacher stated that since he received the second SEC's letter dated June 5, 2003, he had closely watched his speech and behaviors. He also stated that he met with Olson several times in the summer of 2003 to discuss and process this experience and had continued to meet regularly with Hallberg to discuss the aforementioned concerns. Additionally, Schumacher stated that he planned to meet with a therapist in two weeks to address these concerns. In his deposition, Schumacher testified that in the letter, he "was just saying whatever [he] could to get them off [his] back." (Schumacher Dep. at 168.) After sending his letter, Schumacher never contacted Solon to set up another meeting to discuss his progress.

Prior to the second SEC's June 2004 meeting with Schumacher, Schmidt told Solon that Schumacher was going to fail his diagnostic practicum, a prerequisite to earning the Psy.D. degree. Additionally, O'Regan, who had replaced Olson as Schumacher's advisor, sent an e-mail to Solon, reporting on Schumacher's progress in the

area of social awareness.  In the e-mail, dated June 7, 2004, O'Regan stated that he had

met with Schumacher about five times since the beginning of the year and talked about

Schumacher's "self-awareness or lack ther[e]of."  (Solon Aff. at Ex. F.)  O'Regan stated

that "Mark is trying, but how successful is hard to tell."  (*Id.*)  Further, O'Regan stated, "I

suspect that Mark is becoming more sophisticated in his interactions with me, but not

[has] changed his core beliefs, some of which may be offensive to others."  (*Id.*)

On June 14, 2004, the second SEC again met with Schumacher.  Schumacher

presented his personal statement to the second SEC and answered the committee's

questions.  In part, Schumacher indicated in his personal statement that during the last six

months he has "learned more about the effects of my social awareness, general sensitivity,

my attention deficit disorder, and the impact that I have on others around me."

(Schumacher Dep., Ex. 15.)  But in his deposition, Schumacher testified that he was "kind

of forced" into making some of the statements contained in his personal statement and

admits that some parts of it were not "absolutely genuine."  (Schumacher Dep. at 185.)

For example, Schumacher wrote in his personal statement, "I have realized that in

addition to my subtle symptoms of inattention, I also have a tendency to react without

realizing the impact of my words and actions on others around me."  (*Id.* at 187.)  But

Schumacher testified that, "I was just saying that to make Dr. Solon happy."  (*Id.* at 187–

88.)  Additionally, Schumacher wrote, "[o]thers and I have recently seen changes in my

ability to think things through before acting."  (*Id.* at 188.)  But Schumacher testified that

that statement "was something put . . . to appease them."  (*Id.* at 189.)  Finally,

Schumacher concluded his personal statement by writing:

> Though I have learned a lot about myself during the past year, I know that there is still more to learn.  I will always need to be aware of my symptoms and tendencies, and I plan to seriously address them.  This realization is critical to my ability to be an effective psychologist.

(Schumacher Dep. Ex. 15.)  But Schumacher testified that he "was just trying to finish the paper" and that he wrote "whatever [he] could so [he] could stay in the program." (Schumacher Dep. at 191, 257.)

At the conclusion of the meeting, the second SEC unanimously decided to dismiss Schumacher, concluding that he failed to develop and implement a concrete and specific plan to address the committee's concerns.  Additionally, the committee was concerned that Schumacher had completed only half of the required number of reports for his diagnostic practicum and claimed to not understand that he was required to write a certain number of reports during his practicum.  On June 24, 2004, Solon sent Schumacher a letter telling him that he had been dismissed from the Psy.D. program at Argosy.  In that letter, Solon stated in part that Schumacher had "inadequately addressed" the "primary issue of social sensitivity and lack of social awareness" and that Schumacher had "failed to address the secondary concern of alcohol use in any concrete and specific way." (Solon Aff., at Ex. I.)  Solon also stated in the letter that Schumacher failed to meet with her regularly or consistently to monitor his progress and that his personal statement does not address his "insight and progress" on all of the concerns raised by the second SEC. (*Id.*)

Schumacher subsequently appealed his dismissal.  He claimed that the faculty was biased against him based on his religious beliefs and that he was denied due process.  The Appeals Committee denied Schumacher's appeal in a letter dated October 14, 2004.  The committee stated that Schumacher had appealed his dismissal on three grounds:  (1) that "Solon was incapable of objectively assessing your suitability and in chairing the [SEC] due to interactions you had with her in which you expressed a difference in opinion concerning homosexuality;" (2) "[r]eligious harassment in that you allege that the [SEC] was not tolerant of your religious beliefs concerning homosexuality;" and (3) "lack of due process in that you were unaware of the specific charges against you and that you did not have time to adequately review materials and prepare your case."  (Schumacher Dep. at Ex. 26.)  The Appeals Committee found no merit to any of Schumacher's three grounds for appeal and concluded that the second SEC reached the proper results.

Schumacher subsequently initiated this lawsuit, claiming that Defendants dismissed him based on religious discrimination in violation of the MHRA, breached contractual obligations included in Argosy's Campus Handbook, and that his dismissal was arbitrary and in bad faith.  Further, Schumacher claims that Defendants violated various of his federal and state constitutional rights, including his rights to free speech, free exercise of religion, due process, equal protection, and freedom of conscience. Finally, Schumacher claims that the Individual Defendants defamed him by attributing the "No more fag mags" comment to him, either orally or in writing, and by referring to the comment as "homophobic."   Defendants move the Court to grant summary judgment

on the grounds that:  (1) Schumacher's claims arising under the United States and

Minnesota constitutions fail because Argosy is not a state actor; (2) Schumacher's MHRA

claim fails because Argosy did not act in bad faith or dismiss him because of religious

discrimination; (3) Schumacher's arbitrary expulsion claim fails because Schumacher's

dismissal was not arbitrary, capricious, or in bad faith; (4) Schumacher's breach of

contract claim fails because Defendants did not breach any specific promise in Argosy's

Handbook; and (5) Schumacher's libel and slander claims fail for lack of evidence,

because a qualified privilege exists, because the alleged defamatory statements were

opinion, and for lack of harm to Schumacher's reputation.

**Discussion**

## I.     Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court

must view the evidence and the inferences, which may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Enterprise Bank v. Magna*

*Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has

stated, "[s]ummary judgment procedure is properly regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which

are designed 'to secure the just, speedy, and inexpensive determination of every action.'"

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record, which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Constitutional Claims

Defendants contend that Schumacher cannot maintain his constitutional claims because Argosy was not acting under color of state law when it referred him to the SEC or dismissed him.  The protections of the Minnesota constitution are triggered only by state action.  *State v. Wicklund*, 589 N.W.2d 793, 801 (Minn. 1999).  Further, "[i]n cases under § 1983, under color of state law has consistently been treated as the same thing as the state action required under the Fourteenth Amendment."  *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quotations omitted); *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001).  As a general rule, it is presumed that civil rights actions do not apply to private conduct.  *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173 (1972).  Private institutions or persons are generally not considered state actors, but this rule is not absolute, and § 1983 may be used against private defendants and private individuals or institutions who exercise governmental power.  *Payton v. Rush-Presbyterian-St. Luke's Medical Ctr.*, 184 F.3d 623, 628 (7th Cir. 1999).   Because Argosy is a private institution, the issue before the Court is whether Argosy's actions can be considered state action.

Argosy urges the Court to analyze whether a private party's actions can be fairly classified as state action under the "nexus approach" or, alternatively, the "traditional state function" test.  Under the nexus approach, in order for a private entity's action to be classified as state action "there must be a sufficiently close nexus between the challenged action [of the private entity] and the state's regulation so that the action of the former may be fairly treated as that of the state itself."  *Lubin v. Crittendon Hosp. Ass'n*, 713 F.2d

414, 415 (8th Cir. 1983) (citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974).  Argosy contends that summary judgment is appropriate under this test because Argosy is a for-profit private university and receives no public funding except for loans and grants awarded directly to its students.  Further, Argosy contends that neither the State of Minnesota nor the federal government regulate Argosy's student evaluation or dismissal procedures.  Therefore, Argosy contends that Schumacher's dismissal does not constitute state action.

Additionally, Argosy contends that summary judgment is appropriate under the traditional state function test.  Under that test, a private party may be deemed a state actor for purposes of § 1983 liability when he acts under color of state law and performs a function "traditionally exclusively reserved to the state." *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 584–85 (8th Cir. 2006) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)).  Argosy contends that post-secondary education of psychologists bound for private practice is not, and has never been, an exclusive state function.  In support of its position, Argosy points out that the Supreme Court in *Rendell-Baker*, 457 U.S. at 842, held that private education of troubled high school students is not a public function that has traditionally been the exclusive prerogative of the state.

In response, Schumacher does not refute that Argosy was not acting as a state actor under the nexus approach.  But Schumacher asserts that Argosy's action constitutes state action because issuing Psy.D. degrees is a prerequisite to engaging in a state-licensed activity and because regulating authority belongs exclusively to the state.  Schumacher

18

posits that Argosy, through its use and alleged abuse of the student disciplinary process, is

essentially acting as a "gatekeeper" to prevent students from obtaining academic degrees

required to obtain licenses granted by the state.  In support of this argument, Schumacher

contends that there is a relationship between the licensing authority and Argosy and its

members because one of the Individual Defendants has served on the committee that

licenses psychologists in the state of Minnesota.  Thus, according to Schumacher, the

state has delegated its exclusive licensing function to individuals within Argosy.

The Court finds no merit to Schumacher's argument.  Schumacher has not cited

any authority in support of its "gatekeeper" theory and does not attempt to distinguish the

cases cited by Argosy, which hold that private educational institutions are not state actors.

 *See, e.g., Rendell-Baker*, 457 U.S. at 842.  The Court concludes that private education of

psychologists is not an exclusive state function and therefore finds that Argosy's actions

cannot be considered state action.  Additionally, because Argosy was not acting under

color of state law when it dismissed Schumacher, the Individual Defendants were

necessarily not acting as state actors as well.  *See P.N. v. Greco*, 282 F. Supp. 2d 221, 238

(D.N.J. 2003).  Accordingly, the Court finds that Defendants are entitled to summary

judgment on Schumacher's constitutional claims and therefore dismisses such claims.[2]

---

[2]     Alternatively, Defendants contend that even if they were acting under color of
state law, Schumacher's constitutional claims fail for additional reasons.  The Court need
not reach these arguments because it finds that Defendants were not acting under color of
state law and because Schumacher fails to respond to these arguments in his opposition
brief.

### III.   MHRA

Next, Defendants assert that Schumacher cannot establish a violation of the MHRA because there is no evidence that Defendants referred Schumacher to the SEC or dismissed him based on animus toward his religious beliefs.  The MHRA provides that it is an unfair discriminatory practice for an educational institution "to exclude, expel, or otherwise discriminate against a person seeking admission as a student, or a person enrolled as a student because of . . . religion . . . ."  Minn. Stat. § 363A.13, subd. 2 (2006).

Defendants cite *Smith v. Special Sch. Dist. No. 1 (Minneapolis)*, 184 F.3d 764, 769 (8th Cir. 1999), for the proposition that Schumacher must show "gross misjudgment or bad faith on the part of the school officials" in order to recover on his MHRA claim. Defendants assert that Schumacher has proffered no evidence that Argosy exhibited gross misjudgment or acted in bad faith when it referred him to the SEC or dismissed him. Defendants contend that the only "evidence" that Argosy discriminated against Schumacher because of his religion is Schumacher's own speculation that faculty members were out to get him because they did not agree with his religious or political views.  Defendants further contend that the faculty did not refer Schumacher to the SEC as a result of Schumacher's religious beliefs; rather, Defendants contend that the faculty referred Schumacher to the SEC because it had concerns about his social awareness and social sensitivity in general and his respect for diversity in particular.

Schumacher refutes the assertion that the standard for recovery is a showing of gross misjudgment or bad faith.  Schumacher contends that this standard does not apply

20

because the *Smith* court applied that standard based on an apparent agreement between

the parties and because that court relied on *Brantley v. Indep. Sch. Dist. No. 625*, 936 F.

Supp. 649 (D. Minn. 1996), which, according to Schumacher, limits the gross

misjudgment standard to claims involving educational placement, not discipline.

Schumacher contends that the gross misjudgment standard is inapplicable here because

Argosy dismissed Schumacher for disciplinary reasons.  Based on this contention,

Schumacher asserts that the Court should apply the burden-shifting analysis set forth

under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Doan v. Medtronic*,

560 N.W.2d 100 (Minn. Ct. App. 1997) (applying the *McDonnell Douglas* test).

Schumacher asserts that genuine issues of material fact exist based on the faculty's

alleged personal animosity directed at Schumacher and the alleged pattern of

discrimination against conservative, evangelical Christian students.

    The Court need not reach the issue of whether to apply the gross misjudgment

standard.  Although the court in *Brantley* recognized an "arguable[e]" difference between

educational decisions, such as failing to timely diagnose and assess a student's disability,

and a student's dismissal from school, that court did not articulate a different standard.

*Id.* at 657.  The court stated that "even if Plaintiffs need not demonstrate bad faith or

gross misjudgment, this basis for Plaintiffs' claim also fails" because "Plaintiffs have

produced no evidence that [the student] was discriminated against solely on the basis of

his disability."  *Id.*  Likewise, here, there is no evidence that Argosy dismissed

Schumacher based on religious discrimination.  Thus, even if Schumacher need not

demonstrate bad faith or gross misjudgment, his claim nonetheless fails.

In particular, the Court rejects Schumacher's contention that the following evidence creates a genuine issue of material fact:  (1) the faculty exhibited a "pattern of hostility and discrimination" toward conservative, evangelical Christian students; (2) the faculty had "singled out" Schumacher and his three white, male conservative, evangelical Christian friends; and (3) Argosy fosters a "culture of fear," especially with regard to conservative, evangelical Christian students.[3]  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 3–4.)  Allegations regarding an alleged culture of discrimination against "evangelical Christians" as a group are insufficient to defeat summary judgment on Schumacher's individual claim that he was dismissed from Argosy because of his religion.  *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998) ("[A]n individual plaintiff in a private, non-class action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance."), *vacated on other grounds*, 527 U.S. 1031 (1999).  Further, Schumacher has presented no admissible evidence that the faculty's concerns regarding Schumacher's sensitivity to diversity were motivated by discriminatory animus against his religious beliefs.  Indeed, even assuming that the faculty referred Schumacher to the SEC because the faculty

---

[3]     Moreover, for the reasons stated above, the Court has already stricken the affidavits of Joy Fleming, Anne Hall, and Tom Edwards, on which Schumacher relies to support his argument.  *See supra* note 1, at 2.

22

believed he was homophobic, there is no evidence that the faculty connected

Schumacher's views to his religion.  Instead, the undisputed evidence shows that Argosy

dismissed Schumacher because he failed to develop a plan to adequately address the

faculty's concerns, as required by the second SEC.  In fact, Schumacher admits he did not

take the faculty's concerns seriously and that he told them what they wanted to hear.

Accordingly, because there is no genuine issue of material fact as to the alleged

discriminatory referral or dismissal of Schumacher, the Court dismisses Schumacher's

religious discrimination claim under the MHRA.

**IV.    Arbitrary Expulsion**

Next, Defendants contend that Schumacher's claim for arbitrary expulsion fails as a matter of law.  A private university has a common law duty not to expel students in an arbitrary manner.  *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 112 (Minn. 1977).  The *Abbariao* court explained that "[t]he requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities."  *Id.* at 113.  The *Abbariao* court found that it did not need to delineate those requirements "other than to state that academic deficiencies per se are not subject to judicial review."  *Id.*  Nevertheless, the court will intervene when a student's academic expulsion results from the "arbitrary, capricious, or bad-faith actions of university officials.  *Id.* at 112.  The *Abbariao* court further explained that disciplinary expulsions, however, trigger "a panoply of safeguards designed to ensure the fairness of factfinding by the university."  *Id.*

Defendants assert that Argosy dismissed Schumacher for academic reasons and that the dismissal was not arbitrary.  Schumacher asserts that he was not dismissed for academic reasons because there is no evidence that his grade point average was below the acceptable level or that he was failing academically at the time the faculty referred him to the SEC.  Therefore, according to Schumacher, Argosy dismissed him for disciplinary reasons and failed to provide the requisite due process under Minnesota law.  Additionally, Schumacher contends that Argosy's dismissal was arbitrary and capricious.

The Court finds that Argosy dismissed Schumacher for academic reasons.  The undisputed evidence shows that Argosy dismissed Schumacher because he failed to develop and implement an adequate plan to address the second SEC's primary concerns regarding his social awareness and social sensitivity, and its secondary concerns about his alcohol use and ADHD.  There is undisputed evidence that faculty members believed Schumacher's verbal impulsiveness and lack of social awareness were concerning for a future psychologist and could adversely impact his ability to work with diverse populations.  Although Schumacher points out that his grade point average was acceptable and that he was not otherwise failing academically at the time of his referral, academic reasons for dismissal include more than poor grades or a failure to meet minimum graduation requirements.  *See Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir. 2000) (finding that inappropriate behavior during class and inappropriate interaction with instructors are academic factors); *see also Hennessey v. City of Melrose,* 194 F.3d 237, 250 (1st Cir. 1999) (holding that college's dismissal of student teacher based on poor interpersonal skills, inability to communicate effectively with colleagues, and unwillingness to work within the prescribed curriculum was academic); *Lekutis v. Univ. of Osteopathic Med. & Health Sci.*, 524 N.W.2d 410, 413 (Iowa 1994) (holding that medical school's dismissal of medical student was academic, even though dismissal resulted from "gross lack of interpersonal skills, rather than any intellectual deficit").  The Court finds that social awareness and social sensitivity are, indeed, academic factors for a future psychologist.

Because the Court finds that Defendants dismissed Schumacher for academic reasons, the Court may intervene only if Schumacher's dismissal "result[ed] from the arbitrary, capricious, or bad-faith actions of university officials." *See Abbariao*, 258 N.W.2d at 112.  Here, there is no evidence that the faculty dismissed Schumacher in an arbitrary, capricious, or bad-faith manner.  Argosy's actions were not arbitrary, capricious, or in bad faith given that it gave Schumacher notice that he had been referred to the SEC based on concerns regarding his attitudes and behaviors and gave Schumacher six months to develop and implement a plan to address the second SEC's concerns. Given this, the Court dismisses Schumacher's arbitrary expulsion claim.  Alternatively, the Court finds that even if Schumacher was dismissed for disciplinary reasons, he received the requisite procedural due process because he was able to present his side of the story.  *See Zellman ex rel M.Z. v. Indep. Sch. Dist. No. 2758*, 594 N.W.2d 216, 221 (Minn. Ct. App. 1999) (citing *Goss v. Lopez*, 419 U.S. 565, 581 (1975), *review denied* (Minn. Jul. 28, 1999)).

## V.     Breach of Contract

Next, Defendants contend that Schumacher's breach of contract claim fails as a matter of law.  Under Minnesota law, a breach of contract claim consists of four elements:  (1) a valid contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages.  *Parkhill v. Minnesota Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000) (citing *Briggs Trans. Co. v. Ranzenberger*, 217 N.W.2d 198, 200 (Minn. 1974)).  The parties agree that *Alsides v.*

26

*Brown Inst.*, 592 N.W.2d 468 (Minn. Ct. App. 1999), is controlling on the issue of whether the Handbook constitutes a valid contract.  The *Alsides* court held that a student may bring an action against an educational institution for breach of contract when two requirements are met.  *Id.* at 473.  First, the student must allege that the institution failed to perform on specific promises it made to the student.  *Id.*  Second, the claim must not involve an "inquiry into the nuances of educational processes and theories."  *Id.*

Schumacher asserts that the Handbook constitutes a contract because Defendants allegedly breached a specific promise in the Handbook.  In particular, Schumacher contends that the Handbook set forth specific criteria for graduation and did not specify that students may be dismissed for "lack of social awareness" or "social sensitivity."  Schumacher contends that because Defendants dismissed him for reasons other than his failure to complete his classroom or practicum coursework, Defendants breached the Handbook.  Defendants, on the other hand, contend that the Handbook does not constitute a contract because the list of graduation requirements that forms the basis for Schumacher's breach of contract claim is not the type of unambiguous classroom-related pledge that the *Alsides* court recognizes as creating a specific promise.  The Court agrees.

Any failure to disclose that "social awareness" or "social sensitivity" were graduation requirements do not constitute specific promises that would give rise to a breach of contract claim.  Furthermore, the Court concludes that the Handbook did disclose that "social awareness" or "social sensitivity" could be requirements for earning a psychology degree.  Here, the Handbook's list of graduation requirements specifically

states that "[t]he School retains the right to modify these requirements in accordance with the demands of the profession of psychology," and further recognizes that clinical psychology competencies include "[a]ttitudes consistent with the ethical principles governing professional clinical practice including concern for client welfare and respect for client diversity."  (Schumacher Aff., Ex. 3 at 37, 42.)  Finally, addressing this issue would involve an inquiry into the nuances of educational processes and theories. Accordingly, the Court finds that the alleged specific promises in the Handbook did not create a contract, and Schumacher's claim therefore fails as a matter of law.  Thus, the Court dismisses Schumacher's breach of contract claim.

## VI.    Libel and Slander[4]

Finally, Defendants contend that the Court should dismiss Schumacher's claims for libel and slander as a matter of law.  To establish that a statement is defamatory under Minnesota law, the plaintiff must demonstrate that the statement is false, was communicated to a third party, and harmed the plaintiff's reputation.  *Bol v. Cole*, 561 N.W.2d 143, 146 (Minn. 1997).  Defendants assert that Schumacher's claims fail for four independent reasons:  (1) there is no evidence to support a slander claim against Solon or a libel claim against Schaffer; (2) a qualified privilege applies to the statements because they were made in the context of Argosy's student evaluation process; (3) referring to a

---

[4]     Libel and slander are both forms of defamatory statements.  Libel is expressed in a fixed medium, such as writing, and slander is expressed in a transitory form, such as speech.  *See* Black's Law Dictionary 927, 1392–93 (7th ed. 1999).

comment as "homophobic" is opinion and cannot be considered defamatory; and

(4) Schumacher cannot prove that he suffered any harm to his reputation as a result of the

allegedly defamatory communications.   The Court will address each argument in turn.

### A.        Claims Against Solon and Schaffer

Defendants assert that Schumacher cannot maintain a slander claim against

Solon or a libel claim against Schaffer because there is no evidence to support such

claims.  The Court agrees.  In his responsive brief, Schumacher does not address

Defendants' contention that there is no evidence to support a libel claim against Schaffer.

Thus, the Court concludes that Schumacher has abandoned this claim.  *See Thomsen v.*

*Ross*, 368 F. Supp. 2d 961, 974 n.9 (D. Minn. 2005) (concluding that plaintiff had

abandoned claims not addressed in his opposition to summary judgment motion).

Regarding Solon, Schumacher contends that a genuine issue of material fact exists

as to whether Solon attended the spring 2003 faculty meeting, and if so, whether she

failed to correct Griffith when he used the "fag mags" language at that meeting.

Although Solon testified that she was not present at the spring 2003 faculty meeting,

Schumacher contends that Solon's assertion is refuted by two pieces of evidence.  First,

Schumacher points to Griffith's e-mail, in which he stated, "Phyllis [Solon] mentioned in

a faculty meeting that someone had written a homophobic remark on the note . . . ."

(Nickel Aff. at Ex. 6.)  Second, Schumacher points to Olson's July 23, 2003 letter, in

which he stated, "Phyllis [Solon] should not be [on the appeals committee] since [she and

Griffith] were involved in the initial referral and in my judgment the misrepresentation of

what Mark actually wrote."  (Nickel Aff., Ex. 14 at MS00193.)  The Court finds that even if this evidence creates a fact question as to whether Solon attended the spring 2003 faculty meeting, Schumacher's claim nonetheless fails.  Even if Solon attended the spring 2003 faculty meeting, she did not make an alleged defamatory "statement" by failing to correct Griffith when he used the "fag mag" language at that meeting because she has no affirmative duty to contradict a defamatory statement made by another.  *See Hach v. Laidlaw Transit, Inc.*, 2002 WL 31496240, at *5 (N.D. Ill. Nov. 7, 2002) (finding "no affirmative duty to contradict a defamatory statement made by another").  Therefore, the Court dismisses this claim against Solon.

### B.      Qualified Privilege

Defendants also contend that a qualified privilege applies to certain statements made by Griffith and Schaffer.  To be privileged, a statement "must be made in good faith and must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause."  *Bol*, 561 N.W.2d at 149.  A court determines qualified privilege as a matter of law.  *Id.*  When a qualified privilege applies, the speech is constitutionally protected unless the claimant can prove that the statements were made with actual malice.  *Id.* at 150.  In order to show malice, the claimant must demonstrate that the speaker acted with "actual ill-will or a design causelessly and wantonly to injure plaintiff."  *Id.* (citation omitted).

Defendants contend that a qualified privilege applies to:  (1) Griffith's statement to the faculty members at the spring 2003 faculty meeting that Schumacher had written, "no

more fag mags"; (2) Griffith's e-mail to Schaffer with the same language; and

(3) Schaffer's forwarding that e-mail to two other SEC committee members.  Specifically,

Defendants contend that the alleged defamatory statements were made for a proper

purpose, with a proper motive, and based upon probable cause.  In response, Schumacher

asserts that Griffith and Schaffer did not have a qualified privilege because the alleged

defamatory statements were not made with probable cause.  Schumacher relies on *Wirig*

*v. Kinney Shoe Corp.*, 461 N.W.2d 374, 380 (1990), for the proposition that the person

making the alleged defamatory statement must have investigated the validity of the

statement in order to satisfy the probable-cause requirement.  Further, Schumacher

contends that even if a qualified privilege existed, Griffith acted with malice.  As

evidence of malice, Schumacher contends that Griffith is known to be an angry and

volatile man and became angry when Schumacher admitted to writing the comment

during Griffith's class.

    The Court finds that Griffith's and Schaffer's statements were protected by a

qualified privilege.   The alleged defamatory statements were made for a proper purpose

and with a proper motive.  Here, all of Griffith's and Solon's alleged defamatory

statements regarding Schumacher's comment, whether oral or written, occurred because

of and in response to faculty concerns about Schumacher's behavior.  Further, the

statements occurred at the spring 2003 faculty meeting or pursuant to Argosy's SEC

process.  The alleged defamatory statements were also based upon probable cause.  In

particular, Griffith had no reason to believe that there was any dispute over the actual

language of Schumacher's comment because Schumacher admitted to writing the

comment during Griffith's class.  Therefore, although it is troubling that Griffith

inaccurately stated in his e-mail to Schaffer that he had personally observed

Schumacher's comment, this misrepresentation does not eliminate probable cause.

Further, although there was no clarification of the actual language used, Griffith knew

that Schumacher's comment was offensive based on other student's concerns and

Schumacher's admission and apology.  Griffith merely relayed his understanding of the

note's content to the rest of the faculty during the student review and again in the e-mail

to Schaffer in preparation for the SEC meeting with Schumacher.  Thus, Griffith met the

investigatory requirement of *Wirig*.  Further, Schaffer, with no reason to believe Griffith

was mistaken about the contents of the note, forwarded Griffith's e-mail to the other SEC

committee members.  Additionally, the Court rejects Schumacher's assertion that Griffith

and/or Schaffer made the statements with actual malice because there is no evidence that

the statements were motivated by ill-will.  Accordingly, because a qualified privilege

applies, the Court dismisses these claims against Griffith and Schaffer.

## C.    Opinion

Defendants also assert that the fact that Solon and Griffith allegedly referred to

Schumacher as "homophobic" does not constitute defamation because that term is

precisely the sort of non-verifiable language courts routinely view as non-actionable

opinion.  In response, Schumacher contends that referring to Schumacher as

"homophobic" is a statement of verifiable fact, rather than an opinion.  Specifically,

32

Schumacher contends that the alleged "homophobic" reference is verifiable because it was made in a faculty meeting, with regard to the note in the student lounge, and in the context of the "fag mags" language.

The Court finds that referring to Schumacher as "homophobic" does not constitute defamation as a matter of law.  "Opinion is absolutely protected under the First Amendment."  *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)).  Courts consider four factors when determining whether a statement is fact or opinion "(1) specificity and precision [of the statement]; (2) verifiability; (3) literary and social context in which it was made; and (4) public context." *Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn. Ct. App. 1995) (citing *McGrath v. TCF Bank Sav.*, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993)).  Whether a statement can be proven false is a question of law.  *Geraci*, 526 N.W.2d at 397.  After considering these factors, the Court finds that Solon and Griffith's alleged reference to Schumacher as "homophobic" constitutes an opinion.  Such a vague and imprecise reference cannot be verified as a fact.  *See McGrath*, 502 N.W.2d at 808 (holding that the reference to someone as a "troublemaker" was not sufficiently definite to be actionable).  Accordingly, the Court dismisses these claims against Solon and Griffith as a matter of law.

### D.      Reputational Harm

Finally, Defendants assert that Schumacher's defamation claims fail as a matter of law because Schumacher has not suffered harm to his reputation.  Defendants contend

that to the extent any student or faculty member at Argosy had an opinion regarding

Schumacher's beliefs toward homosexuals, those opinions were caused by Schumacher's

own outspokenness, as evidenced by the comment he wrote and by his voluntary

classroom admission that he authored the comment.   Additionally, Defendants contend

that any harm caused by Griffith's attribution of the term "fag mags" rather than "gay

mags" to Schumacher was cured because the SEC was made aware of the correct

language before rendering any decisions.   In response, Schumacher contends that both

faculty and students held a more negative and distorted view of Schumacher based on

Griffith's assertion that Schumacher wrote "fag mags" instead of "gay mags."   As

evidence that he suffered harm to his reputation, Schumacher points to Olson's July 23,

2003 letter in support of Schumacher's appeal of the first SEC's decision, in which Olson

stated:

> I am concerned that left standing, the accusation against Mark is not only
> false, but also damaging to Mark's reputation as a student in good standing
> in our doctoral program and as a future professional.  I share his concern
> about how he will be treated in the future in our school.

(Nickel Aff., Ex. 13 at MS0084.)

The Court finds that there is no evidence to show that Schumacher suffered harm

to his reputation.  The Court finds that any harm caused by Griffith's attribution of the

term "fag mags" rather than "gay mags" to Schumacher was cured because the SEC

learned of the correct language before rendering a decision.  *See Gertz*, 418 U.S. at 344

(holding that a negative impact to one's reputation is minimized when an incorrect

statement is remedied).  Here, it is undisputed that Schumacher convinced the first SEC

during their meeting and before the first SEC issued its remediation plan that the

comment said "gay mags," not "fag mags."  Additionally, any lingering damage was

further corrected when Schumacher successfully appealed the first SEC's decision and

was granted a new SEC hearing.  Thus, Olson's concern that a false accusation might be

"left standing" was dispelled when Schumacher won his appeal.  Accordingly, the Court

grants summary judgment in favor of the Individual Defendants on Schumacher's

defamation claims.

**Conclusion**

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.     Defendants' Motion for Summary Judgment (Doc. No.39) is **GRANTED**.

2.     The First Amended Complaint (Doc. No. 35) is **DISMISSED WITH**

**PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  December 6, 2006          s/Donovan W. Frank
                                  DONOVAN W. FRANK
                                  Judge of United States District Court